AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of California

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. |
| | ) | |
| TARIQ ARRHAMANN MAJID | ) | |
| | ) | |
| | ) | |
| _Defendant(s)_ | ) | |

**FILED**

JAN 0 2 2019

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

2:19 - MJ . 001 - DB

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s)   ___Described in the attached affidavit___   in the county of   ___Solano___   in the
___Eastern___   District of   ___California___  , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 USC § 2252(a)(2) | Receipt/Distribution of Child Pornography |
| 18 USC § 2251(a) | Sexual Exploitation of Children |

This criminal complaint is based on these facts:

(see attachment)

☒   Continued on the attached sheet.

_____
_Complainant's signature_

California Highway Patrol Investigator Rich Washabaugh
_Printed name and title_

Sworn to before me and signed in my presence.

Date: __12-30-18__

City and state: __Sacramento, CA__

_____
_Judge's signature_

Deborah Barnes, U.S. Magistrate Judge
_Printed name and title_

1                **AFFIDAVIT IN SUPPORT OF PROBABLE CAUSE**

2         I, Richard Washabaugh, your Affiant, being duly sworn, depose and the following:

3         1.      This affidavit is made in support of a complaint and to arrest warrant alleging violations

4 of 18 U.S.C. § 2252(a), Receipt/Distribution of Child Pornography, and § 2251(a), Sexual Exploitation

5 of Children, by Tariq Arrhamann Majid ("Majid").

6         2.      Based on the facts set forth herein, I submit that there is probable cause to believe that

7 Majid has violated 18 U.S.C. § 2252(a), Receipt/Distribution of Child Pornography, and § 2251(a),

8 Sexual Exploitation of Children.

9         3.      The facts and conclusions in this affidavit are based on my personal knowledge gained

10 from my participation in this investigation, my training and experience, and information gained from

11 other law enforcement officers, and reports. Since this affidavit is being submitted for the limited

12 purpose of securing a complaint and arrest warrant, I have not included each and every fact known to me

13 concerning this investigation. I have only set forth the facts that I believe are necessary to establish

14 probable cause for the alleged violations.

15                     **TRAINING AND EXPERIENCE**

16         4.      I have been a California Peace Officer for the last eight years and am employed by the

17 California Highway Patrol (CHP). I am currently assigned as a high technology computer crimes

18 investigator for the Computer Crimes Investigation Unit (CCIU) of the CHP where I have had training

19 in various aspects of computer crimes. As a member of CCIU, I have duties as a Task Force Officer

20 (TFO) with the Federal Bureau of Investigation (FBI) Cyber investigations squad in Sacramento. I have

21 been deputized as a Special Deputy for the United States Marshals Service (USMS), sponsored by the

22 FBI, in order to investigate violations of federal law.

23         5.      While at this assignment, I have completed numerous investigations including the

24 possession of child pornography, network intrusions, social engineering, theft and fraud and have

25 prepared numerous search warrants related to these crimes. Prior to my assignment with CCIU, I was

26 assigned to patrol in the Oakland area Office. During my tenure at this assignment, I interviewed

27 hundreds of victims, witnesses, and suspects in connection with auto theft, shootings, criminal threats,

28 assaults and identity theft. This helped introduce me to the methodology and motivation involved in the

1   commission of these types of felony crimes.  During my tenure there, I also prepared numerous search
2   and arrest warrants relating to the crimes that I have mentioned.

3       6.      Prior to my employment with the CHP, I earned a Bachelor of Arts in History from the
4   University of California, Davis.  My initial training with the CHP included 27 weeks of instruction at the
5   CHP academy in West Sacramento.  This training included traffic law enforcement, as well as other
6   related criminal activity, including fraud, rape, kidnapping, and assault.  I graduated in October 2010
7   with a Basic Certificate from California's Commission on Peace Officer Standards and Training
8   (POST).

9       7.      During my career with the CHP, I have received numerous hours of investigator training
10  including field training, classroom instruction, methods on how to investigate crimes, interview and
11  interrogation methods, and preparing search warrants, which I have incorporated into many of the search
12  warrants I have written.  In addition, I have attended a 16 hours POST certified search warrant class
13  taught by the Northern California High Intensity Drug Traffic Area group.  I have also received 120
14  hours of investigator training that included 80 hours of Criminal Investigations Core Course training
15  from the Robert Presley Institute of Criminal Investigations.  This course included field training,
16  academic instruction, criminal investigation methodology, interview and interrogation methods, and
17  instruction on preparing search warrants.  During my tenure with the CCIU, I have also received over
18  600 hours in specialized training in digital forensics presented by Guidance Software, BlackLight
19  Technologies and the California Department of Justice, Advanced Training Center.  This training
20  involved the seizing, processing and searching of digital evidence in a forensically sound manner across
21  multiple operating systems.  It also covered the best practices involved in digital forensics and high
22  technology investigations.

23      8.      I have additionally received training in the investigation of child pornography over Peer
24  to Peer (P2P) networks through the Internet Crimes Against Children Task Force (ICAC), of which I am
25  a member.

26                          **STATUTORY VIOLATIONS**

27      9.      Section 2252(a)(2) of Title 18, Receipt/Distribution of Child Pornography, provides: (a)
28  Any person who – (2) knowingly receives, or distributes, any visual depiction using any means or

                                    2

1 facility of interstate or foreign commerce or that has been mailed, or has been shipped or transported in
2 or affecting interstate or foreign commerce, or which contains materials which have been mailed or so
3 shipped or transported, by any means including by computer, or knowingly reproduces any visual
4 depiction for distribution using any means or facility of interstate or foreign commerce or in or affecting
5 interstate or foreign commerce or through the mails, if— (A) the producing of such visual depiction
6 involves the use of a minor engaging in sexually explicit conduct; and (B) such visual depiction is of
7 such conduct;

8    10.    Section 2251(a) of Title 18, Sexual Exploitation of Children, prohibits a person from
9 employing, using, persuading, inducing, enticing, or coercing any minor to engage in, or to have a minor
10 assist any other person to engage in, or to transport any minor in or affecting interstate or foreign
11 commerce, with the intent that such minor engage in any sexually explicit conduct for the purpose of
12 producing any visual depiction of such conduct or for the purpose of transmitting a live visual depiction
13 of such conduct.

14                                   **DEFINITIONS**

15    11.    The following definitions apply to this affidavit:

16  a.  The term "minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of
17       eighteen years.

18  b.  The term "child pornography" is defined in 18 U.S.C. § 2256(8) as: "[A]ny visual depiction,
19       including any photograph, film, video, picture, or computer or computer-generated image or
20       picture, whether made or produced by electronic, mechanical, or other means, of sexually
21       explicit conduct, where – (A) the production of such visual depiction involves the use of a minor
22       engaging in sexually explicit conduct; (B) such visual depiction is a digital image, computer
23       image, or computer-generated image that is, or is indistinguishable from, that of a minor
24       engaging in sexually explicit conduct; or (C) such visual depiction has been created, adapted, or
25       modified to appear that an identifiable minor is engaging in sexually explicit conduct.

26  c.  The term "sexually explicit conduct" is defined in 18 U.S.C. § 2256(2)(a) as "actual or
27       simulated – (i) Sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-
28       anal, whether between persons of the same or opposite sex; (ii) bestiality; (iii) masturbation; (iv)

1  sadistic or masochistic abuse; or (v) lascivious exhibition of the genitals or pubic area of any

2  person."

3  **THE INTERNET AND TECHNICAL TERMS RELATING TO COMPUTERS**

4  12.    As part of my training, I have become familiar with the Internet (also commonly known

5  as the World Wide Web), which is a global network of computers and other electronic devices that

6  communicate with each other using various means, including standard telephone lines, high-speed

7  telecommunications links (e.g., copper and fiber optic cable), and wireless transmissions including

8  satellite.  Due to the structure of the Internet, connections between computers on the Internet routinely

9  cross state and international borders, even when the computers communicating with each other are in the

10  same state.  Individuals and entities use the Internet to gain access to a wide variety of information; to

11  send information to, and receive information from, other individuals; to conduct commercial

12  transactions; and to communicate via electronic mail ("e-mail").  An individual who wants to use

13  Internet e-mail must first obtain an account with a computer that is linked to the Internet (through a

14  university, an employer, or a commercial service such as an "Internet Service Provider" or "ISP" (see

15  definition of "Internet Service Provider" below).  Once the individual has accessed the Internet, that

16  individual can use Internet mail services, including sending and receiving e-mail.  In addition, the

17  individual can visit web sites and make purchases.

18  13.    Set forth below are some definitions of technical terms, used throughout this Affidavit,

19  pertaining to the Internet and computers more generally.

20  a.  **Internet Service Providers (ISPs) and the Storage of ISP Records:**  Internet Service

21      Providers (ISP) are commercial organizations that are in business to provide individuals and

22      businesses access to the Internet.  ISPs provide a range of functions for their customers including

23      access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and

24      other communications equipment.  ISPs can offer a range of options in providing access to the

25      Internet including telephone based dial-up, broadband based access via digital subscriber line

26      (DSL) or cable television, dedicated circuits, or satellite based subscription.  ISPs typically

27      charge a fee based upon the type of connection and volume of data, called bandwidth, which the

28      connection supports.  Many ISPs assign each subscriber an account name – a user name or

4

screen name, an "e-mail address," an e-mail mailbox, and a personal password selected by the subscriber. By using a computer equipped with a telephone or cable modem, the subscriber can establish communication with an ISP over a telephone line or through a cable system, and can access the Internet by using his or her account name and personal password. ISPs maintain records (ISP records) pertaining to their subscribers (regardless of whether those subscribers are individuals or entities). These records may include account application information, subscriber and billing information, account access information (often times in the form of log files), e-mail communications, information concerning content uploaded and/or stored on or via the ISP's servers, and other information, which may be stored both in computer data format and in written or printed record format. ISPs reserve and/or maintain computer disk storage space on their computer system for their subscribers' use. This service by ISPs allows for both temporary and long-term storage of electronic communications and many other types of electronic data and files. Typically, e-mail that has not been opened by an ISP customer is stored temporarily by an ISP incident to the transmission of that e-mail to the intended recipient, usually within an area known as the home directory. Such temporary, incidental storage is defined by statute as "electronic storage" (18 U.S.C. § 2510 (15)). A service provider that is available to the public and provides storage facilities after an electronic communication has been transmitted and opened by the recipient, or provides other long-term storage services to the public for electronic data and files, is defined by statute as providing a "remote computing service" (18 U.S.C. § 2711(2)).

b. **Internet Protocol Address (IP Address):** Every computer or device on the Internet is referenced by a unique Internet Protocol (IP) address the same way every telephone has a unique telephone number. An IP address is a series of four numbers separated by a period. Each number is a whole number between 0 and 254. An example of an IP address is 192.168.10.102. Each time an individual has accessed the Internet, the computer from which that individual initiated access is assigned an IP address. A central authority provides each ISP a limited block of IP addresses for use by that ISP's customers or subscribers. Most ISP's employ dynamic IP addressing, that is they allocate any unused IP addresses at the time of initiation of an Internet

5

session each time a customer or subscriber has accessed the Internet. A dynamic IP address is reserved by an ISP to be shared among a group of computers over a period of time. The ISP logs the date, time, and duration of the Internet session for each IP address and can identify the user of that IP address for such a session from these records. On the other hand, some ISP's, including most cable providers, employ static IP addressing, that is a customer or subscriber's computer is assigned one IP address that is used to identify each and every Internet session initiated through that computer. In other words, a static IP address is an IP address that does not change over a period of time and is typically assigned to a specific computer.

c.  **Log file**: Log files are records automatically produced by computer programs to document electronic events that occur on computers. Computer programs can record a wide range of events including remote access, file transfers, logon/logoff times, and system errors. Logs are often named based on the types of information they contain. For example, web logs contain specific information about when a Web site was accessed by remote computers; access logs list specific information about when a computer was accessed from a remote location; and file transfer logs list detailed information concerning files that are remotely transferred.

d.  **Trace Route**: A trace route is an Internet debugging tool used to document the list of inter-connected computers between two computers on the Internet. A trace route will list the names and IP addresses of computers that provide the physical link between two computers on the Internet. Trace routes are useful tools to help geographically identify where a computer on the Internet is physically located, and usually includes information about the registered owner of computers on the Internet.

e.  **Uploading**: Uploading is transmission of a file from one computer to another computer. From an Internet user's point-of-view, uploading is sending a file to a computer that is set up to receive it.

f.  **Downloading**: Downloading is the transmission in the other direction: from one computer system to another. From the Internet user's point-of-view, to download a file is to request it from another computer (or from a Web page on another computer) and to receive it.

g.  **Hash values/hashing**: A hash function or hash algorithm is a function for summarizing or

6

assigning a value for identifying data. Such a summary is known as a hash value or simply a hash and the process of computing such a value is known as hashing. A hash value can then act as a signature for the original data, without revealing its contents.

    i.  Every image, photograph, document or movie found on a computer can be run through a hashing process that will calculate the unique hash value for that file. A hash value is a set of numbers and letters strung together and, once assigned, this hash value cannot be altered. If the same image is hashed twice, the hash value will remain consistent; however, if even 1 pixel of an image is altered that new image will generate a new hash value.

    ii.  A hash value is a mathematical fingerprint of a digital photograph or movie, and is most often used by file-sharing networks such as eMule to help identify and authenticate specific photographs or movies.

    iii.  There are several types of popular hash functions, including MD5 and SHA-1, but each operate in basically the same way, with the SHA-1 hash function assigning a hash value that is typically longer than that used by the MD5 hash function. The eMule network uses the MD4 hash function.

h.  **Peer-to-Peer (P2P):** P2P file sharing programs are a standard way of transferring files from one computer system to another while connected to the Internet. Peer-to-Peer file sharing programs allow groups of computers using the same file sharing network, e.g. "eMule" to connect directly with each other and to share files from one another's computer systems.

i.  **Peer-to-Peer Hash Database**: A database of hash values calculated from known Child Pornography images and videos. This database is housed in Florida, USA. This database has been in existence since 2004. Officers that are trained in Child Exploitation investigations contribute to the contents of the database. The database is regularly audited to maintain its integrity and conforms to the US definition of Child Pornography.

**COMPUTERS AND CHILD PORNOGRAPHY**

14.  Based upon my knowledge, training, and experience in child exploitation and child pornography investigations, and the experience and training of other law enforcement officers with

7

1   whom I have had discussions, computers and computer technology have revolutionized the way in

2   which child pornography is produced, distributed and utilized.  Prior to the advent of computers and the

3   Internet, child pornography was produced using cameras and film, resulting in either still photographs or

4   movies.  The photographs required darkroom facilities and a significant amount of skill in order to

5   develop and reproduce the images.  As a result, there were definable costs involved with the production

6   of pornographic images.  To distribute these images on any scale also required significant resources.

7   The photographs themselves were somewhat bulky and required secure storage to prevent their exposure

8   to the public.  The distribution of these wares was accomplished through a combination of personal

9   contacts, mailings, and telephone calls, and compensation for these wares would follow the same paths.

10   More recently, through the use of computers and the Internet, distributors of child pornography use

11   membership-based/subscription-based web sites to conduct business, allowing them to remain relatively

12   anonymous.

13        15.   In addition, based upon my own knowledge, training, and experience in child exploitation

14   and child pornography investigations, and the experience and training of other law enforcement officers

15   with whom I have had discussions, the development of computers has also revolutionized the way in

16   which child pornography collectors interact with, and sexually exploit, children.  Computers serve four

17   basic functions in connection with child pornography: production, communication, distribution, and

18   storage.  More specifically, the development of computers has changed the methods used by child

19   pornography collectors in these ways:

20       a.   Producers of child pornography can now produce both still and moving images directly from a

21           common video or digital camera.  The camera is attached, using a device such as a cable, or

22           digital images are often uploaded from the camera's memory card, directly to the computer.

23           Images can then be stored, manipulated, transferred, or printed directly from the computer.

24           Images can be edited in ways similar to how a photograph may be altered.  Images can be

25           lightened, darkened, cropped, or otherwise manipulated.  The producers of child pornography

26           can also use a device known as a scanner to transfer photographs into a computer-readable

27           format.  As a result of this technology, it is relatively inexpensive and technically easy to

28           produce, store, and distribute child pornography.  In addition, there is an added benefit to the

pornographer in that this method of production does not leave as large a trail for law enforcement to follow.

b. The Internet allows users, while still maintaining anonymity, to easily locate (i) other individuals with similar interests in child pornography; and (ii) web sites that offer images of child pornography. Child pornography collectors can use standard Internet connections, such as those provided by businesses, universities, and government agencies, to communicate with each other and to distribute child pornography. These communication links allow contacts around the world as easily as calling next door. Additionally, these communications can be quick, relatively secure, and as anonymous as desired. All of these advantages, which promote anonymity for both the distributor and recipient, are well known and are the foundation of transactions between child pornography collectors over the Internet. Sometimes the only way to identify both parties and verify the transportation of child pornography over the Internet is to examine the recipient's computer, including the Internet history and cache to look for "footprints" of the web sites and images accessed by the recipient.

c. The computer's capability to store images in digital form makes it an ideal repository for child pornography. The size of the electronic storage media (commonly referred to as a hard drive) used in home computers has grown tremendously within the last several years. Hard drives with the capacity of 1000 gigabytes are not uncommon. These drives can store thousands of images at very high resolution. Magnetic storage located in host computers adds another dimension to the equation. It is possible to use a video camera to capture an image, process that image in a computer with a video capture board, and save that image to storage in another country. Once this is done, there is no readily apparent evidence at the "scene of the crime." Only with careful laboratory examination of electronic storage devices is it possible to recreate the evidence trail.

### THE eMULE NETWORK

16.     I know from my training and experience that peer-to-peer (P2P) networks are frequently used in the trading of child pornography. I know that one network, known as the eMule network, is being used to trade digital files, including still image and movie files, of child pornography. Based on my training and experience, I know the following about the operation of the eMule file-sharing network:

9

a.  The eMule network can be accessed by computers running many different client programs, some of which include Limewire, Shareaza, and Bearshare to name a few. These programs share common protocols for network access and file sharing. The user interface, features and configuration may vary between clients and versions of the same client.

b.  During the installation of a eMule client, various settings are established which configure the computer to share files. Depending upon the eMule client used, a user may have the ability to reconfigure some of those settings during installation or after the installation has been completed.

c.  Typically, a setting establishes the location of one or more directories or folders whose contents (files) are made available to other eMule users to download. This location is commonly referred to as the "Shared Folder."

d.  Files located in a user's shared directory are processed by the client software. As part of this processing, an MD4 hash value is computed for each file in the user's shared directory.

e.  A "digital file" processed by this MD4 operation results in the creation of an associated hash value often referred to as a digital signature. One can conclude with certainty which greatly exceeds 99.99 percent that two or more files with the same MD4 digital signatures are identical copies of the same file regardless of their file name.

f.  The eMule network uses MD4 values to improve network efficiency. Users may receive a selected file from numerous sources by accepting segments of the file from multiple users and then reassembling the complete file on the local computer. The client program succeeds in reassembling the file from different sources only if all the segments came from exact copies of the same file. The network uses MD4 values to ensure exact copies of the same file are used during this process.

g.  The client programs, when installed and running, allows the user to search for pictures, movies and other files by entering descriptive text as search terms.

h.  Entering search terms returns a list of files and descriptive information including in some client software the associated MD4 digital signature. By using this procedure, a person is able to compare the MD4 signatures of files being shared by users in the network to the MD4 signatures of any file including those of movies or images of child pornography. Once a matching set of

1    digital signatures is identified, a person using this publicly available software client is able to

2    initiate a download of this file through the eMule network.  These results are presented to the

3    user to allow that user to select a file to download and then to receive it from other users.

4  i.  When a download of a file is initiated, the user is presented with a list of users (candidates) who

5    broadcasted to the eMule network that they have the requested file available for others to

6    download.

7  j.  Obtaining files from the eMule network, as described herein, returns the candidate list, including

8    IP addresses, which can be used to identify the location of computers.  A review of the MD4

9    signatures allows an investigator to identify the files which are child pornography.

10  k.  The Child Protection System (CPS) is a computer software program developed by Special Agent

11    Flint Waters, Wyoming Division of Criminal Justice.  CPS has several functions that assist in the

12    regionalization and tracking of IP addresses.  Utilizing several automated detection processes,

13    CPS will identify and log huge quantities of worldwide IP addresses that are identified as

14    participating in the possession and distribution of child pornography.  Investigators can access

15    the CPS system and perform a query identifying suspect IP addresses that are in their

16    jurisdiction.  CPS will also keep record of each time an IP address is identified as being a

17    download candidate for suspected child pornography on the eMule network.  CPS also keeps

18    record of each time a user's GUID is identified as being a download candidate for suspected

19    child pornography on the eMule network.

20  l.  When an investigator queries activity within their jurisdiction, they are presented with a list of IP

21    addresses generated by the CPS allowing them a starting point for a potential investigation of a

22    computer which is likely to be within their jurisdiction.

23  m.  This process allows investigators to identify computers, originating from an IP address likely to

24    be in their jurisdiction containing eMule or compatible software and possessing suspected child

25    pornography files.

26  n.  Once a computer at a specific IP address is identified as being in possession of child

27    pornography, investigators, using the CPS software, can generate a historical report showing the

28    dates and times that a computer at that particular IP address was logged on the eMule network

and the MD4 hash values of any suspected child pornography images or videos that was being shared by that computer. This function is known as the "IP History".

o.   When an IP is identified by the CPS system, typically the GUID associated to the eMule client operating on that computer is captured.   An investigator, using the CPS software, can also generate a historical report showing the dates and times that a specific GUID was logged on the eMule network, the IP address used and the SHA1 hash values of any suspected child porn images or videos shared by that computer.   This function is known as the "GUID History"

17.       Detective William Wiltse, Oregon Police Department, created an automated software application called Peer Spectre that searches the eMule network for files using known child pornography search terms. The software application identifies computers at IP addresses that have files in their shared folder whose hash values match the database of suspected child pornography hash values. The software reads these reported download candidates and logs the IP address, time, date, MD4 hash values and filenames for each individual computer in the same way every time. The information gathered by Peer Spectre is uploaded to the Child Protection System, allowing officers the ability to query that data at any time. Each file of suspected child pornography is documented and run through various other hashing algorithms (MD5, SHA-1, etc.).

18.       I know from my training and experience that an investigator can review these details and identify a pattern of activity that links a single IP address to specific files of child pornography with an extremely high degree of accuracy. Peer Spectre automates the search process but conducts and reports the search in the same manner that has previously been done by individual investigators. Peer Spectre does not report details that are not also discoverable by the general public using Internet available software.

### CONDUCT OF INDIVIDUALS INVOLVED IN CHILD PORNOGRAPHY

19.       Based upon my training and experience, and the training and experience of other law enforcement officers with whom I have spoken or whose reports I have read, as well as my conversations with suspects, I am aware that the following characteristics are generally found in varying combinations in people who produce, trade, distribute, or possess images of minors engaged in sexually explicit conduct:

12

a. These people view children as sexual objects. They receive gratification from sexually explicit images of minors.

b. These people collect sexually explicit images of minors, which they use for their own sexual gratification and fantasy.

c. Some of these people do not dispose of sexually explicit images of minors because the images are treated as prized possessions. They store such images in many different formats including photos, printouts, magazines, videotapes, and many forms of digital media such as hard drives, diskettes, and CD-ROMs. They store such images in many different places including their home, their car, and other areas under their control.

d. Those that do dispose of sexually explicit images of minors often do so in order to avoid detection. Peer to peer networks make child pornography readily available for download at any time. These people often download and delete the same set of illicit images or videos repeatedly rather than permanently storing them.

e. These people use sexually explicit images of minors as a means of reliving fantasies or actual sexual encounters. They also use the images as keepsakes and as a means of gaining acceptance, status, trust, and psychological support by exchanging, trading, or selling the images to other people with similar interests.

f. These people go to great lengths to conceal and protect from discovery their collection of sexually explicit images of minors. They may have passwords to access programs or control encryption written down either in the vicinity of their computer, or on their person, for instance, in their wallet or an address book.

g. These people maintain images of minors with whom they have had sexual contact. If such a person takes a picture of a minor, depicting the minor in the nude, there is a high probability the minor was used to produce sexually explicit images.

## THE INVESTIGATION AND FACTS SUPPORTING PROBABLE CAUSE

20.     On October 15, 2018, I accessed the Child Protective System (CPS) for the purpose of investigating California computers in order to identify persons involved in the receipt and distribution of child pornography and sexual exploitation of children through the use of P2P file sharing over the

1  Internet.  The Internet is a means and facility of interstate and foreign commerce.

2       21.    At this time I noted that IP address 73.170.194.164 was identified by the Child Protective

3  System (CPS) automated software as a download candidate for suspected child pornography

4  approximately 1588 times from July 4, 2018 and October 12, 2018.

5       22.    I also noted the filenames, reported by CPS, as displayed by the computer located at IP

6  address 73.170.194.164.  The following are some of the filenames reported by the software:

7       •    little Thaiboys-bibcam_ 2009_ fucks cums_kdv _rbv. boys_ pedo_ best _very cute thai

8      bois_pjk_p101_preteen.9548.avi

9       •    K99 - Jonatan Cum Bj (Pthc Gay Pedo) Boy - 13Yo Jerks Off Then Sucks Cam Guy_

10      Facial - k99 - Jonatan.avi

11       •    12yr old boy fucking a 10yr old girl (3min 26secs).MPG

12

13       23.    I know that filenames do not always accurately depict the contents of the file so I

14  compared the SHA1 hash values of the above files (as reported by CPS) with the same SHA1 hash

15  values of known child pornography files recovered in previous investigations.  These files had been

16  downloaded, from previous investigations and are maintained for verification purposes.  I queried the

17  SHA1 hash values of the above files and found them to depict the listed conduct:

18

19       •    SHA1 hash value TP4A7NZSCLXGUONNRQN7I6PIFU3T7BZC, shared by the suspect

20      at the IP address 73.170.194.164 on **October 12, 2018** at 0918 hours GMT.

21

22       24.    I viewed this file from a previous investigation and found it to be a color video which

23  was 9 minutes in length.  The video depicts two juvenile males engaged in oral copulation and anal sex

24  with each other.  The file is identified by name as "(b) little Thaiboys-bibcam_ 2009_ fucks cums_kdv

25  _rbv. boys_ pedo_ best _very cute thai bois_pjk_p101_preteen.9548.avi"

26

27       •    SHA1 hash value TWB22KC5CDI54LTSFHNCBWXEHQRZCDHF, shared by the

28      suspect at the IP address 73.170.194.164 on **October 7, 2018** at 0724 hours GMT.

25.     I viewed this file from a previous investigation and found it to be a color video which was 19 minutes and 52 seconds in length. This video depicts a juvenile male masturbating and inserting a foreign object into his own anus. The boy then orally copulates an adult male. The file is identified by name as "K99 - Jonatan Cum Bj (Pthc Gay Pedo) Boy - 13Yo Jerks Off Then Sucks Cam Guy_ Facial - k99 - Jonatan.avi"

•      SHA1 hash value F3XAZD5UJ7TL2KCQSGOH3RRGHLZ42ZBSshared by the suspect at the IP address 73.170.194.164 on **October 7, 2018** at 0427 hours GMT.

26.     I viewed this file from a previous investigation and found it to be a color video which was 3 minutes and 26 seconds in length. The video depicts a juvenile male engaged in vaginal sex with a juvenile female. The file is identified by name as "12yr old boy fucking a 10yr old girl (3min 26secs).MPG"

27.     I used the internet IP trace program http://www.centralops.net and I was able to determine Comcast Cable Communications (Comcast) issued the IP address 73.170.194.164 to the subscriber. The address further resolved to an unknown user in Solano County. I have used the internet IP trace program http://www.centralops.net for this purpose multiple times for approximately 50 prior investigations.

28.     Centralops.net utilizes ARIN's Whois a query and response protocol that is used for querying databases that store registered users or assignees of an Internet resource, such as IP addresses or domain names.

29.     ARIN's Whois service is a public resource that allows a user to retrieve information about IP number resources, organizations, and Points of Contact (POCs) registered with ARIN. It pulls this information directly from ARIN's database, which contains IPv4 and IPv6 addresses, Autonomous System Numbers (ASNs), organizations, customer reassignments, and related POCs.

30.     Based on my training and experience, and based on the foregoing, I believe that a violation of18 U.S.C. § 2252(a)(2) occurred. The SHA1 has values associated with the files

15

1    downloaded by the suspect IP address 73.170.194.164 were confirmed as child pornography by my
2    observation.  The file names also contain common child pornography terms such as "pthc," and refers to
3    the victims ages, "13Yo and 10 yr old."

4        31.    On October 18, 2018, I sent a preservation request to Comcast requesting the records
5    related to the suspect IP address on the date of October 7, 2018 and October 12, 2018 at the times of the
6    above downloads be preserved.

7        32.    On October 19, 2018, I authored Solano County Search Warrant 68-1018 for the
8    subscriber information related to the IP address of 73.170.194.164 which was signed by the Honorable
9    Judge Donna Stashyn, Solano Superior Court Judge.  I served this search warrant to Comcast Cable
10   Communications via their online law enforcement portal.

11       33.    On October 24, 2018, I received an email from Comcast stating a response had been
12   posted to their law enforcement portal.  This response identified the following subscriber for the IP
13   address 73.170.194.164 at the noted time of the above downloads:

14       Cintia Ochoa

15       **164 Coloma Way**

16       **Vallejo, CA 94589**

17

18       34.    On November 26, 2018, I obtained a search warrant for 164 Coloma Way Vallejo, CA,
19   signed by the Honorable Judge Wendy Getty, and I along with other officers executed it.

20       35.    During the execution of the warrant, ten residents were identified:

21       **MAJID, TARIQ (Not present at the time of service)**

22       MELGOZA, YOHAN

23       OCHOA, JOSE

24       OCHOA, JOVANI

25       MUERA, GUADALUPE

26       LOPEZ, MICALALA

27       AMERICANO, MARIANA

28       SIERRA, WALTER

1   NAVARRO, JOSE CARLOS

2   NAVARRO, ALEJANDRO

3

4     36.    Several of the residents were interviewed, but Majid as not present at that time. Through

5  the interviews, I learned that Guadalupe Muera rented out the rooms to people, including her son Jose

6  Ochoa and his family. According to Ochoa, he had given the Wi-Fi password to Majid and Yohan

7  Melgoza. Ochoa stated Majid often had children come to the house to play video games in his room.

8  Jose Ochoa told Majid multiple times not to bring children in the house but Majid continued to do so.

9  He stated he had seen a laptop in Majid's room.

10     37.    While conducting the search, one of the investigators performed a live preview of an

11  Alienware laptop located in Majid's room, using a forensically sound program. Investigator Andrade

12  navigated to the file path: ThisPC\Downloads\eMule\Incoming and noted it contained 60 files.

13  Investigator Andrade was able to see approximately 20 files which were all videos. These video files all

14  had file names consistent with child pornography terms such as pthc [pre-teen hard core], 10yo and

15  12yo. Investigator Andrade viewed the file's thumbnail picture (which is a single frame of the video)

16  and identified 11 of these thumbnails as child pornography.

17     38.    Investigator Cates also located a photograph of a man with three young boys in  Majid's

18  room. I brought Jose Ochoa into the room, pointed to the picture and asked who the man was. Jose

19  Ochoa stated this was Majid.

20     39.    After further investigation confirming Majid's identity, he was located and placed in

21  custody based on the child pornography found on the computer in the room he was renting.

22     40.    Investigators began processing the evidence taken from Tariq Majid's room at the CCIU

23  and they located multiple files that they identified as child pornography across several devices. They

24  further located several picture and video series depicting the sexual assault of at least one child on a bed

25  closely resembling Tariq Majid's.

26     41.    Following Majid's arrest, he was taken into custody and interviewed. Following an

27  advisement of his *Miranda* rights, Majid related the following, in summary:

28  a.   Majid had been renting a room at 164 Coloma Way Vallejo, CA for approximately six months.

17

He has his own room and spends most of his time at work. He stated he had been sexually molested as a child and was still trying to deal with the pain and trauma.

b. Majid was shown several photographs of his room and bed taken from the search warrant that morning. Tariq Majid identified them as belonging to him. He was shown the first photograph from a series found on his devices which depicted a young boy who appeared to be unconscious on a bed similar in size, form and bedsheets to Tariq Majid's bed. Tariq Majid admitted the bedsheets were his, that he had taken this series of photographs and admitted he had exposed the boy's genitalia and photographed him. Tariq Majid identified this boy to Investigator Cates and me. The boy will be referred to as John Doe 1.

c. Investigator Cates showed Majid a second photograph which was also the first in a series that depicted the sexual assault of another young boy. The bedding in this series was also consistent with the blankets and sheets seen on Tariq Majid's bed. Tariq Majid identified this child by first name only and he will be referred to as John Doe 2. Majid made admissions to taking these photographs and a video and of fondling the boy's genitalia. John Doe 2 is currently about 20 years old, but had met Majid when he was a minor. The video appears to depict John Doe 2 when he was a minor.

d. Majid told Investigator Cates we would locate four or five other such victims, who he had photographed in a similar manner, in the devices we had seized.

e. Later, Investigator Cates identified John Doe 1 as being 9 years of age at the time the exploitative photographs had been taken. When John Doe 1 was later located, it was learned that he is currently 16 years old. Thus, the series of images taken of him occurred in or about 2011. Majid indicated in the interview that he had lived in Vallejo during this time.

42. Approximately 150 images and videos were discovered during the search which depicted the sexual assault of John Doe 1 and John Doe 2. Below are details of two of these images/videos:

   i. John Doe 1: I noted the file DSCF2239.JPG while searching Item 1 (A Toshiba Hard Disk Drive). This image file is the ninth in a series which depict John Doe 1 asleep in a supine position on bed sheets which closely resemble Majid's bedding. This image depicts John Doe 1's pants and underwear pulled aside so that his genitalia are exposed

18

while a black adult hand manipulates his penis. John Doe 1 appears to be prepubescent in this image based on his physical attributes. According to this file's EXIF data (information stored within the file) the image was taken on January 4, 2011 by a FUJIFILM FinePix JX310 digital camera. According to John Doe 1's date of birth he would have been 9 years old if this time is correct. Based on my training and experience I know that FUJIFILM cameras are manufactured outside of the United States.

    ii.    John Doe 2: I noted the file "HBO.AVI" while searching Item 4 (A Hitachi Portable Hard Disk Drive). The file is a color video, one minute and twenty-seven seconds in length. This video file depicts John Doe 2 laying, shirtless in a supine position on bed sheets which closely resemble Majid's bedding. His shorts and underwear are pulled aside so that his genitalia are exposed and a black adult hand masturbates John Doe 2's penis. John Doe 2 appears asleep throughout the video. Based on the video's metadata, it was taken on September 2nd, 2012 using the same FUJIFILM FinePix JX310 digital camera. Based on John Doe 2's date of birth, he would have been fourteen years old if this time is correct.

43.    Majid was ultimately arrested on state charges of Possession of Child Pornography, California Penal Code 311.11(a); Possessing over 600 images of Child Pornography, California Penal Code 311.11(c)(1); and Production of Child Pornography, California Penal Code 311.1(a).[1]

44.    Following the interview, I loaded the image of the operating system drive taken from Majid's laptop into EnCase V.8.07.00.93 and exported the NTUSER.DAY file associated with the user profile "tariq." (Investigator's Note: The NTUSER.DAT file contains information associated with a particular user's profile on a windows computer. This can include the most recently used and/or accessed files and information related to attached devices.).

45.    I exported the NTUSER.DAT file and used RegRipper 2.8 to decode the data. I noted the some of the following under the "Recent Docs:"

recentdocs v.20100405

---

[1] He bonded out of custody on or about 12/30/18.

(NTUSER.DAT) Gets contents of user's RecentDocs key

RecentDocs

**All values printed in MRUList\MRUListEx order.

Software\Microsoft\Windows\CurrentVersion\Explorer\RecentDocs

LastWrite Time Tue Nov 27 17:12:47 2018 (UTC)

86 = Alienware RAM Capture 0911 hrs

114 = Alienware.dmp

92 = F:\

144 = IEFTriageAndStandard (F:)

69 = System and Security

147 = ::{BB06C0E4-D293-4F75-8A90-CB05B6477EEE}

80 = Temp

7 = [pthc_preview.mp4

3 = lh

. . . .

85 = pthc 2017 asian boy fucked by father and jerk of dick for cum(1).mp4

99 = inA©dit-slideshow-vidA©o jura little boylove preteen pedo nude gay boy 10yo -24'33"-.mp4

53 = PTHC 2017 Marusa Awesome 10yo Red Hair Girl 04.mkv

96 = New 2018 Vicky Collection babyboy4cumfun 12 yo boy Pedoman nude children pedo NABULT 14yo.mpg

50 = New Olaf Framke Collection 2006 - Zoophilia Part 7 - Pedo Underage Children Animals Rape Bdsm Scat Snuff Bizarre Pthc Kiddy Boy Gay Torture Sodomie.rm

136 = 12Yo Girl Gets Fucked By A 10Yo Boy With Cocksuck And At Last Creampie.avi

89 = 11 and 12 yr old spanish boys suck each other off.mpg

104 = [Naturist Boy] Fkk Nudist - FAS-Family (Preteen Boys).wmv

123 = [boylove].Chinese little boy like 11yo was fucked by man. insert ass and cum on face screaming and crying.mkv

1   . . . .

2   68 = Tariq Majid Resume 2018.pdf

3   87 = Chivo

4   88 = chivo best.AVI

5   . . . .

6   65 = Axel

7   . . . .

8   137 = Pedo - Yoboy-Man-10Yo-Blonde-Boy-Sucks-And-Is-Anal-Fucked-15m35S.mpg

9   42 = Olaf Framke Collection v0023 - Gay Boys Anal Blowjob Hardcore Sex Pedo Lolita Rape

10   Bondage Hentai Fkk Kiddy Preteen Underage Pthc.mpg

11   105 = Olaf Framke Collection v0006 - Gay Boys Anal Blowjob Hardcore Sex Pedo Lolita Rape

12   Bondage Hentai Fkk Kiddy Preteen Underage Pthc.mpg

13   26 = Olaf Framke Collection 2007 - v186 - Pedo Gay Kiddy Boys Bareback Pthc Bizzare

14   Zoophilia Rape Underage Bdsm Hentai Scat Snuff.mpg

15   107 = Olaf Framke Collection 2007 - v113 - Pedo Gay Kiddy Boys Bareback Pthc Bizzare

16   Zoophilia Rape Underage Bdsm Hentai Scat Snuff_mout.avi

17   . . . .

18   51 = Man Teaching 12Yo Cute Boy Fuck (Preteen Dick Ass Erection Sex Porno Pedo Bibcam

19   Incest Shota Naked).mpg

20   14 = lolitabay lsh sweetlolita pthc-pedo-lolita Vicky Collection childlover 10yo boys

21   PedoBrother.mkv

22   56 = lolita4u recife 2018 pthc deedesi frifam Indian lolita 9yo pthc-pedo-lolita.mpg

23   84 = liluplanet Vicky Collection pthc-pedo-lolita VIDEO-ANGELS 12yrs goddess on green

24   young speedo boy.mpg

25   38 = kiddy pthc-pedo-lolita pthc-preteen-pedo 11aÃƒÂ¢ÃƒÂ,Â±os 2018 pthc Tara kingpass.mpg

26   21 = Goicochea Vincent Pedofilia French Collection R@Ygold Nice 04 (Man & Preteen Boy)

27   Gay Dildo 10Yo Pthc Hussyfan.mpg

28

1      46.     Forensic experts have located approximately 500 video files and approximately 10,000

2 image files depicting child pornography across all devices seized from Majid's room, person or vehicle.

3      47.     On or about November 29, 2018, John Doe 1 was located. He is currently 16 years old.

4 John Doe 1's mother was present and identified Majid in a photograph, claiming he was her son's

5 "mentor." John Doe 1 identified himself in a photograph located during the search. He identified the

6 bed sheets as Majid's and further related that the hand in the photograph pulling his shorts to the side

7 appeared to be Majid's. John Doe 1 became very emotional at this point.

8      48.     Investigators identified approximately 51 photographs in the series depicting the sexual

9 assault of John Doe 1 who was determined to be 9 years old at the time of the assault.

10      49.     During the investigation, investigators received information that Majid had been a mentor

11 at the Boys and Girls Club of Napa.

12      50.     Multiple other potential victims were located. One such individual, John Doe #4,

13 indicated that Majid would show up at his apartment complex and kids would come to visit with him.

14 When he visited with Majid, Majid would choose one kid to spend the night at his place. He also

15 reported that Majid liked to teach martial arts to children and taught them about the right foods to eat

16 and would always make smoothies for the kids.

17      51.     During the search of Majid's residence, investigators found generic Ambien and a

18 children's cold medicine.

19      52.     Another person, John Doe #13, reported that he did not like Majid because he would

20 wrestle and play games that made him feel uncomfortable, especially a "tickles" game.

21      53.     Another person, Jane Doe #3, reported that she spent many nights at Majid's. After

22 learning that Majid had been charged with child pornography offenses, her little brother, John Doe #12,

23 stated that he thought he would be one of the children in those pictures.

24      54.     Another person, John Doe #3 reported that whenever he needed to use Majid's bathroom,

25 Majid would go into the bathroom first and clean up.

26      55.     One juvenile male living in Majid's residence at the time of the search reported that

27 Majid would frequently offer him food and to buy him gifts, but that he didn't feel comfortable

28 accepting them. This juvenile reported seeing Majid with a lot of younger boys and assumed he was

1  mentoring.

2  **CONCLUSION**

3      52.    For the reasons stated above, there is probable cause to believe that Tariq Majid had

4  committed violations of 18 U.S.C. §§ 2252(a)(2) and 2251(a).

Richard Washabaugh
Investigator, Computer Crimes Investigation Unit
(CCIU), California Highway Patrol

Approved as to form:

Michele Beckwith
Assistant United States Attorney

Subscribed and sworn to before me

This 20 day of December 2018.

HON. DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

23